United States District Court
Southern District of Texas
**ENTERED**
September 12, 2016
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

| | |
|---|---|
| JEANETTE SLAUGHTER, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | CIVIL ACTION NO. G-12-018 |
| § | |
| COLLEGE OF THE MAINLAND, § | |
| § | |
| Defendant. § | |

## OPINION AND ORDER

Before the Court, with the consent of the parties, is Defendant College of the Mainland's Amended Motion for Summary Judgment (Dkt. Nos. 52-54), to which Plaintiff Jeanette Slaughter filed a response (Dkt. Nos. 62, 63), and Defendant filed a reply and objections to Plaintiff's summary judgment evidence. (Dkt. Nos. 65, 66). After reviewing the submissions of the parties and the applicable law, the Court issues this Opinion and Order.

## I. BACKGROUND

Jeanette Slaughter (Slaughter) brought suit against the College of the Mainland (COM) under Title VII and 42 U.S.C. §§ 1981 and 1983,[1] claiming that she was subjected to retaliation after she was identified as a witness in a co-worker's complaint of sexual harassment by Al Bass (Bass), the director of the Physical Education, Leisure Activities, Wellness and Seniors (hereinafter, "PELAWS" or "the Department").

---

[1] Slaughter claim under 42 U.S.C. §1981 was previously dismissed.

The undisputed evidence in this case reflects that Slaughter was an employee of COM from 1988 until 2014. In 1997, Slaughter transferred to the PELAWS Department in the gymnasium area where she worked as a clerk and then later became an Administrative Assistant.[2]

In 2006, the Director of Wellness, Mary Ann Urick, left the Department. Bass, who had worked in the Department since 1988 as an instructor or supervisor, agreed to assume some of Urick's supervisory duties. Slaughter and Geneva Murphy (Murphy), who was another Administrative Assistant, also agreed to assist in performing the additional duties and, in return, they were both provided with a 10% stipend which would continue until the position was filled.

In September 2007, Bass was promoted to lead the Department and shortly thereafter he began reorganizing the Department. As part of the reorganization, Bass hired Tige Cornelius (Cornelius) and Marlon Stevens (Stevens) to assume the duties once held by Urick and to provide the day-to-day task of supervising all Department personnel. Once Cornelius and Stevens assumed their supervisory positions, it eliminated the need for Slaughter and Murphy to continue to perform the additional duties and, hence, both were notified that their last stipends for "additional duties" would be September 2008.

On October 17, 2008, an employee in the Department, Sandra Brewer (Brewer), filed a grievance against Bass in which she alleged that he subjected her to sexual harassment and, in support of her claim, Brewer identified Slaughter as a witness. (Dkt. No. 52, Ex. 1(f); Dkt. No. 54, Ex. 15; Dkt. No. 65, Ex. 1). Following an investigation, Brewer's grievance was dismissed

---

[2] The duties of an Administrative Assistant are largely clerical and, unlike other positions, it is not paid based on merit. (Dkt. No. 52, Ex. 1(d)). Rather, with this position any adjustments in pay are made by COM's Board of Trustees and applied on a collective and equal basis. (*Id.*).

by COM; however, Brewer then re-urged her claims in state court where she brought suit against COM on February 16, 2010. (Dkt. No. 54, Ex. 15 (*Brewer v. College of the Mainland*, 2014 WL 3361921 (Tex.App.- Houston [1st Dist.] 2014)).

In late June 2010, after urging employees in the Department to set aside their various personality issues and work together (Dkt. No. 52, Ex. 1(f)), Bass received a report from an employee that Slaughter was overheard making inappropriate and unprofessional comments about him to Tammy Stafford (Stafford), another Administrative Assistant in the Department.[3] (Dkt. No. 52, Exs. 1(d), 1(f)). The report of Slaughter's "couch" comment triggered an investigation that included meetings with Slaughter's immediate supervisors[4] and then with Bass.[5] Throughout all the meetings, Slaughter steadfastly denied making the statement and Stafford stated that she did not recall Slaughter making the comment. With insufficient evidence to substantiate the report, the investigation was closed and Slaughter received neither a disciplinary action nor a disciplinary memorandum. (Dkt. No. 52, Exs. 1(a); 1(f)).

Following the investigation, Slaughter filed a grievance on August 19, 2010, claiming that Bass initiated the investigation of the reported couch comment as a means of retaliating against her

---

[3] The employee reported that when a couch was being moved into or an area near Bass's office, she overheard Slaughter comment to Stafford that Bass had always wanted a sofa in his office and "now he doesn't have to go to a motel." (Dkt. No. 52, Ex. 1(d)).

[4] On June 29, 2010, Slaughter was called in to meet with Cornelius and Stevens. According to Slaughter they showed her an "unsigned Level 2 disciplinary action for 'slander of a co-worker' and for being unable to maintain socially acceptable behavior standards of conduct suitable to cooperative and efficient work environment." (Dkt. No. 25 at 5).

[5] On July 8, 2010, Bass called Slaughter into his office and presented her with an unsigned, but revised disciplinary action that alleged "slander of an administrator and defiance of a departmental directive given at the meeting of June 22, 2010." (Dkt. No. 25 at 6). On July 12, 2010, Bass once again called Slaughter into his office where Stafford was also present. (Dkt. No. 25 at 6-7).

for because she was identified as a witness in Brewer's complaint against him for sexual harassment. (Dkt. No. 52, Ex. 1(a)). Slaughter also claimed that Bass had retaliated against her following the investigation of the reported couch comment by instructing other employees, under threat of discipline, not to interact with her. (Dkt. No. 25 at ¶36). In support of her contentions, Slaughter submitted audio recordings that she surreptitiously made during her July meetings with Bass.[6] (*Id.*). COM investigated Slaughter's allegations and concluded that, while the evidence did not support a finding that Bass had retaliated against Slaughter, Bass had not been forthcoming during the investigation and, thus, in addition to placing him on a two week leave of absence, COM disciplined Bass for his conduct. (Dkt. No. 52, Exs. 1(a), 1(f)).

From August 23, 2010, to September 6, 2010, Slaughter was temporarily assigned to the senior adult office – an office outside of the gym – where she was asked to work until a vacancy, which resulted from the retirement of an employee, was filled.[7] (Dkt. No. 53, Ex. 14). During this two week period of time, Slaughter performed duties that were consistent with her position as an Administrative Assistant and her pay and benefits remained the same. When Myers was able to assume the position on September 6, 2010, Slaughter returned to work in the gym area. (Dkt.

---

[6] In the recordings, Bass can be heard to reference the charges Brewer made against him two years earlier and how Brewer had smeared Slaughter's name all over her complaint. In addition, Bass commented to Slaughter that "That's the beauty of it. Things always have a way of presenting themselves, if you just wait." (Dkt. No. 25 at ¶¶24, 31-33). Finally, while Bass can be heard asking rhetorical questions "Did I think about getting you?; Did I think about bringing you down" and he is also heard responding "yes, he had" thought about it, but he denied ever acting upon his thoughts. (*Id.*).

[7] The evidence reflects that a position at the senior adult office became available in the fall of 2010, due to a retirement. Slaughter was offered the job, which was a 40 hour-a-week position, but she declined the position. (Dkt. No. 52, Ex. 1(d)). After Slaughter declined the position, it was given to Bonnie Myers, who had worked as an Administrative Assistant in the Wellness Center. (*Id.*). However, due to personal reasons, Myers was not able to assume the position when it became vacant and, as such, Slaughter was temporarily assigned to fill-in until Myers returned. (*Id.*, Ex. 6(a)).

No. 52, Ex. 1(d)).

When Slaughter returned to the gym area, she was assigned to work in the Wellness Center, which was located on the north side of the gym.[8] Similar to her previous assignment, Slaughter's duties in the Wellness Center included checking people into the gym, as well as performing other tasks that were routinely carried out by an Administrative Assistant. In addition, her pay and benefits remained the same. Nevertheless, Slaughter felt that working in the Wellness Center was a "less desirable" assignment and she objected to numerous conditions[9] in the area. (Dkt. No. 25 at 9). COM made several changes in response to Slaughter's complaints (*i.e.*, a door chime was installed; a surveillance mirror was installed; her desk was moved away from the open space to a converted office space), however, Slaughter's complaints persisted.[10] Although unrelated to her complaints, a decision was made to close the Wellness Center at the end of the summer of 2011. With the closure of the Center, Slaughter, along with her supervisor and the other part-time employees who worked in the area, were moved to the faculty suite on the south side of the gym. (Dkt. No. 52, Ex. 1(d)).

After Slaughter returned to the faculty suite, she complained that her classification was not changed when she was first assigned to the Wellness Center in September 2010. In other words,

---

[8] The Wellness Area had its own entrance and was restricted only to listed members.

[9] For example, Slaughter voiced complaints that her desk was not partitioned off; that her desk was next to a water fountain; that the temperature in the area was problematic; that she felt the area was not safe because she did not have a clear view of the entrance to see who was entering the building; that the flooring in the area was concrete rather than carpeted like the front area; that there were more insects on this side of the building; that the HVAC system did not work well; and that she could not access her supervisor easily and had to leave her work area to locate her supervisor.

[10] After COM converted office space for Slaughter, she complained that the area used to be part of the men's locker room and the back wall of her office, which abutted the men's shower, felt damp.

5

Slaughter, who was a 35 hour-a-week employee – a classification that she had held for several years in the Department -- maintained that she should have been elevated to a 40 hour-a-week employee when she was assigned to the Wellness Center in September 2010. (Dkt. No. 53, Ex. 12). COM responded to the delayed complaint[11] by informing Slaughter that a change in classification was not merited because the 40 hour-a-week position was eliminated based on costs. (Dkt. No. 52, Ex. 1(f)). Nonetheless, approximately two years later, due to a change initiated on a campus-wide basis by the new College President, Slaughter, among others, received a change in classification to a 40 hour-a-week employee. On February 28, 2014, Slaughter retired. (Dkt. No. 52, Ex. 1(d)).

On November 17, 2011, Slaughter brought suit against COM asserting claims of retaliation under Title VII and, pursuant to 42 U.S.C. §§ 1981 and 1983, a First Amendment retaliation claim. COM moved for summary judgment on all of Slaughter's claims.[12] (Dkt. No. 52). Following the submissions by the parties, COM's Motion for Summary Judgment is ripe for adjudication.

## II. STANDARD OF REVIEW

The Court analyzes Defendant's Motion under the well-established summary judgment standard. Fed. R. Civ. P. 56(c); *see generally, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 576, 586-87 (1986); *Burge v. Parish of St. Tammany*, 187 F.3d 452, 464 (5th Cir. 1999); *United States v. Arron*, 954

---

[11] According to COM, while Slaughter frequently complained about different issues while she assigned to the Wellness Center, this was not included in her complaints. Slaughter first raised the issue after the Wellness Center closed in August 2011 and she returned to the faculty suite.

[12] *Supra* note 1.

F.2d 249, 251 (5th Cir. 1992).

## III. DISCUSSION

### A. Title VII Retaliation Claim

Slaughter alleges that COM subjected her to retaliation in violation of Title VII. Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits employers from retaliating against an employee for engaging in activity protected by the Act. 42 U.S.C. § 2000e *et seq.*; *Fitzgerald v. Sec'y, U.S. Dept. of Veterans Affairs*, 121 F.3d 203, 206 (5th Cir. 1997). A plaintiff can establish her Title VII claim either by direct or circumstantial evidence. *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002). However, in the absence of direct evidence,[13] the plaintiff's Title VII claims are properly analyzed under the *McDonnell Douglas* burden shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973).

As modified, the *McDonnell Douglas* framework consists of three stages. First, the plaintiff must establish a *prima facie* case of retaliation, which "creates a presumption that [her

---

[13] Direct evidence cases are exceeding rare because most employers do not expressly state a retaliatory purpose for their actions. This case is no exception. Despite Slaughter's urging to the contrary, the evidence she offers (*i.e.*, the recordings she made of the meetings with Bass in mid-2010, and a 2009 email that a former co-worker, Sorenson sent to Bass when she was seeking a job with another employer) falls short of direct evidence because it requires the trier of fact to infer a nexus between the evidence and the alleged retaliatory action (*i.e.*, she was moved to a different work area with poor condition, she was isolated, she was not included in meetings, *etc.*). *See Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002) (explaining that direct evidence is "evidence that, if believed, proves the fact of discriminatory animus without inference or presumption"); *Jones v. Overnite Transp. Co.*, 212 Fed.Appx. 268, 274 (5th Cir. 2006) ("[t]he need to infer or presume the causal connection means that the statements are not direct evidence of intentional race discrimination"); *but see, Jones v. Robinson Prop. Group, L.P.*, 427 F.3d 987, 993 (5th Cir. 2005) (plaintiff's claim was supported by direct evidence because two witnesses testified to "decision maker(s) in the poker room us[ing] race as a factor in employment decisions."). Nevertheless, even if it were sufficient, as discussed herein, the undisputed evidence in this case demonstrates that the same allegedly adverse action would have occurred regardless. *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).

employer] unlawfully [retaliated] against [her]." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Second, if the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the employment action taken against the plaintiff. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993). The employer's burden is one of production, not proof, and involves no credibility assessments. *See, e.g., West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 385 (5th Cir.2003). Third, if the employer meets its production burden, the plaintiff must show that the legitimate, non-retaliatory reason proffered by the employer "[is] not its true reason, but [was] a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Burdine*, 450 U.S. at 253); *see also EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615 (5th Cir.2009).

### 1. The *Prima Facie* Case

Analyzing Slaughter's Title VII claim under this framework, Slaughter bears the burden – albeit not a substantial one – of making a *prima facie* showing of retaliation. *See Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996) (applying same framework to Title VII retaliation claims). To state a *prima facie* claim of retaliation, the plaintiff must demonstrate that: (1) she engaged in activity protected by Title VII; (2) she suffered an adverse employment action; and (3) a causal link existed between the protected activity and the adverse employment action. *Mato v. Baldauf*, 267 F.3d 444, 450 (5th Cir.2001).

#### a. The Protected Activity

For purposes of a Title VII retaliation claim, "protected activity" consists of opposing any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII. 42 U.S.C. §2000e-3(a).

There is no real dispute that Slaughter can demonstrate that she was involved in protected activity under Title VII. Specifically, Slaughter can show that she was involved in protected activity when she agreed to be identified as a witness in the grievance Brewer submitted to COM on October 17, 2008, alleging that Bass subjected Brewer to sexual harassment; and, once again, when Brewer brought a lawsuit against COM in February 2010. (Dkt. No. 54, Ex. 15; Dkt. No. 65, Ex. 1). 42 U.S.C. §2000e-3(a); *Crawford v. Metro. Gov't of Nashville and Davidson County, Tenn.*, 555 U.S. 271, 279 (2009); *see also, Dubaz v. Johnson Control World Servs.*, 163 F.3d 1357, 1998 WL 858836, at *2 (5th Cir. Nov. 20, 1998) (determining that a plaintiff engaged in protected activity when she offered deposition testimony in a lawsuit). In addition, Slaughter can show that she engaged in protected activity on August 19, 2010, when she filed her own grievance against Bass alleging retaliation (Dkt. No. 52, Ex. 1(a)); and on December 13, 2010, when she filed her charge of retaliation with the EEOC. (Dkt. No. 53, Ex. 6(a)).

### b. Adverse Employment Action

The second element of a *prima facie* case requires Slaughter to show that she suffered an adverse employment action. Unlike the disparate-treatment provisions in Title VII, the scope of the anti-retaliation provision is not limited to conduct that constitutes "ultimate employment decisions"; instead, the provision "extends beyond workplace-related or employment-related retaliatory acts and harm." *Burlington Ne. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) (rejecting the standard in *Mattern* to the extent it treated the anti-retaliation provision as forbidding only the limited category of "ultimate employment decisions" prohibited by the antidiscrimination provision). The anti-retaliation provision protects an individual not from all retaliation, but from actions that a reasonable employee would have found materially adverse. *Id.* at 67–68.

9

"Material" employer actions are those "that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Id.* at 68 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)). Normally, petty slights, minor annoyances, and simple lack of good manners will not create such deterrence. *Id.*

Slaughter contends that she was subjected to several adverse employment actions in retaliation for her filing these grievances and/or charges. (Dkt. No. 25 at 3, 6-7, 8-9). COM maintains that the allegedly adverse actions that occurred in 2008 are time barred; and, with regard to the subsequent employment actions of which Slaughter complains, COM argues that, even under the broader definition, none constitutes "materially adverse" employment actions. (Dkt. No. 52). The Court addresses the alleged actions in turn.

### *Loss of Compensation and "Management" Duties*

Slaughter claims that she suffered a materially adverse employment action when she lost her stipend and management duties in September 2008. COM maintains that the failure to file a retaliation charge with the EEOC within 300 days of those discrete acts bars Slaughter's claim in this court. (Dkt. No. 52 at 12-14). The Court agrees. The evidence clearly reflects that Slaughter's charge of retaliation was filed on December 13, 2010, which is much more than 300 days after these discrete actions[14] occurred (*i.e.*, the elimination of the stipend and the loss of her "management" duties in September 2008), thus, they are untimely. *See* 42 U.S.C. §2000e-5(e)(1); *see also, E.E.O.C. v. WC&M Enterprises, Inc.*, 496 F.3d 393, 398 (5th Cir.2007); *Ikossi-*

---

[14] *See Hamic v. Harris Cnty., W.C. & I.D. No. 36*, 184 F. App'x 442, 447 (5th Cir.2006) (holding that the continuing violations doctrine does not apply to claims of retaliation because "retaliation is, by definition, a discrete act, not a pattern of behavior").

10

*Anastasiou v. Bd. of Supervisors of Louisiana State Univ.*, 579 F.3d 546, 552 (5th Cir. 2009).

### *Threats of Discipline and Isolation*

Slaughter asserts that she was subjected to a materially adverse action when Bass initiated an investigation and threatened her with disciplinary action over the reported couch comment. Slaughter's contentions do not rise to the level of actionable conduct because there is no dispute that she received no disciplinary action or memorandum regarding the reported comment. *See Brooks v. Houston Ind. Sch. Dist.*, 86 F.Supp.3d 577, 586 (S.D.Tex. 2015) (concluding that an unimplemented decision to discipline an employee is not a materially adverse employment action to support a retaliation claim); *Brandon v. Sage Corp.*, 61 F.Supp.3d 632, 649-50 (W.D.Tex. 2014) (concluding that threatened pay cuts, which never came to fruition, did not constitute a materially adverse employment action).

Slaughter also asserts that she was isolated from meetings, information and other personnel within the Department; that she was no longer on speaking terms with Bass who was her ultimate supervisor; and that other employees were instructed by Bass not to interact with her. As a matter of law, these allegations do not rise to the level of material adversity. *See Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 484-85 (5th Cir. 2008) (allegations of being treated poorly and rudely are not enough as a matter of law to state a retaliation claim); *King v. Louisiana*, 294 Fed.Appx. 77, 85 (5th Cir. 2008) ("allegations of unpleasant work meetings, verbal reprimands, improper work requests, and unfair treatment do not constitute adverse employment actions" for retaliation claims); *Muniz v. El Paso Marriott*, 773 F.Supp.2d 674, 682 (W.D.Tex.2011) (ostracism by fellow employees is not a materially adverse employment action that constitutes retaliation). Instead, they fall into the category of "petty slights, minor annoyances, and simple

lack of good manners" that employees regularly encounter in the workplace, but which are not actionable retaliatory conduct. *See Burlington*, 548 U.S. at 67 (recognizing that the law does not protect against trivial harms, but only those that produce an injury or harm).

### *Removal From Workplace*

Next, Slaughter contends that she was "removed from the workplace pending the alleged investigation" into her August 2010 grievance. To the extent that Slaughter can be heard to suggest that she was placed on leave pending the investigation, there is simply no support for this assertion.[15] However, Slaugther was assigned to work in the senior adult office for a two week period. (Dkt. No. 25 at 7). Ordinarily, temporary work assignment are not considered materially adverse. *Anthony v. Donahoe*, 460 Fed.Appx. 399, 404 (5th Cir.2012). The circumstances of this case prove no exception. In other words, given the circumstances,[16] a reasonable person would not conclude that this temporary re-assignment would have dissuaded a reasonable worker from making charges of discrimination. *Burlington*, 548 U.S. at 68; *Anthony*, 460 Fed.Appx. at 404.

### *Re-Assignment to and Loss of Compensation in the Wellness Area*

Slaughter asserts that when she returned to the gym area on September 6, 2010, she was assigned to the Wellness Center, which was located on the north side of the gym. A lateral

---

[15] The evidence only reflects that Bass was placed on a leave of absence pending COM's investigation into Slaughter's August 2010 grievance.

[16] The evidence reflects that Slaughter was temporary assigned to the senior adult office for two weeks because the position was vacant due to a retirement where Slaughter performed duties that fell within the confines of her job description of an Administrative Assistant; there is no evidence that the duties were any more arduous or less prestigious than her assignment in the gym and she experienced no change to her salary or her benefits. *See Webb v. Round Rock Indep. Sch. Dist.*, 2013 WL 4434245, at *5-6 (W.D.Tex. 2013); *Phillips v. Nissan North America, Inc.*, 2012 WL 2254274 at *3-5 (S.D.Miss. 2012).

reassignment to a position with equal pay could amount to a material adverse action in some circumstances, however, this is not such a case. *Cf. Washington v. Ill. Dep't of Rev.*, 420 F.3d 658, 662 (7th Cir. 2005) (finding lateral transfer materially adverse where it impacted employee's flex-time schedule which was critical to care for her disabled child); *Kessler v. Westchester Cty Dep't of Soc. Servs.*, 461 F.3d 199, 209-10 (2d Cir. 2006) (finding lateral transfer which did not impact job title, job grade, salary or benefits could be found materially adverse where employee demonstrated that he was stripped of significant responsibilities). While it is evident that Slaughter did not prefer the change, there is no evidence that the assignment produced a change in her primary duties, her pay or other benefits. Even though her specific tasks in the Wellness Center might have varied from those she performed in the front area of the gym, her duties remained clerical in nature – no more arduous or less prestigious – and were consistent with the description of the job duties of an Administrative Assistant. *See Burlington*, 548 U.S. at 71 (noting that reassignment of job duties is not automatically actionable; material adversity of a reassignment "depends on the circumstances of a particular case"). Additionally, Slaughter's complaints regarding the conditions of the Wellness Center – which were, in large part, addressed by COM – fail to demonstrate that her reassignment to the Wellness Center was a materially adverse action under a reasonable employee standard.[17] *See Burlington*, 548 U.S. at 68 (noting the standard is objective). On the contrary, there is no evidence that Slaughter's assignment to the Wellness Center dissuaded her from participating as a witness in the Brewer matter or prevented her from

---

[17] Slaughter's allegations would suggest that she was akin to a lone survivor on a deserted island, but this is simply not supported by any evidence. Despite her assertions, the undisputed evidence shows her supervisor had his office right next to hers; that others worked in the area; and that her predecessor, Bonnie Myers, had worked in the same classification and was located in the same space that Slaughter considered undesirable.

filing her own complaints concerning her working conditions.

### c. Causal Connection

Even assuming that Slaughter could demonstrate that she suffered a materially adverse employment action with regard to claims of lost compensation, the initial burden still rests with her to make a *prima facie* showing that a causal connection existed between the protected activity and the adverse action. COM maintains that Slaughter cannot demonstrate that a causal connection existed with regard to these claims because these allegedly adverse employment actions pre-dated any formal complaint to COM by either Brewer or Slaughter. (Dkt. No. 52). The Court agrees. Despite her subjective beliefs, which are insufficient to create a question for a jury regarding causation, the evidence in this case reflects that Slaughter lost her stipend and "management" duties in September 2008, which was *before* Brewer submitted her grievance to COM identifying Slaughter as a witness to Bass's sexual harassment of her.[18] *See Allbritain v. Tex. Dep't of Ins.*, No. A-12-CA-431-SS, 2014 WL 272223, at *10 (W.D.Tex. Jan. 23, 2014) (where adverse action occurred before the protected activity, no retaliation claim could be sustained because of the lack of causal link). Additionally, with regard to the 2010 compensation claim, the evidence demonstrates a long-existing distinction between the weekly classification of the Administrative Assistants, which pre-dated any formal complaint by either Brewer or Slaughter to COM.[19] *Id.*

### 2. COM's Legitimate, Non-Retaliatory Reasons

Nevertheless, even assuming that Slaughter had made out a *prima facie* case of retaliatory discrimination under Title VII, any presumption of a retaliatory motive would drop out because

---

[18] Dkt. No. 52, Ex. 1(f); Dkt. No. 54, Ex. 15; Dkt. No. 65, Ex. 1.

[19] Dkt. No. 52, Ex. 1(d).

14

COM has articulated a legitimate, non-retaliatory reason for its decisions. In particular, COM explained that after Bass was promoted in 2007, he reorganized the supervisory structure of PELAWS by bringing in two coordinator level positions, which eliminated the need for the administrative assistants to continue to perform the additional duties they had assumed and for which COM agreed to pay them a stipend. (*See* Dkt. No. 52, Ex. 1d). Additionally, Slaughter was not the only one effected by this change; rather, Murphy, who Slaughter alleged was favored by Bass, also lost the same stipend and "management" duties. (Dkt. No. 52, Ex. 4).

With regard to the decision to temporarily assign Slaughter to the senior adult office, which was outside of the gym area, COM explained that an employee's retirement created a vacancy which it initially asked Slaughter to assume as a promotion, however, she declined. Bonnie Myers, who was an Administrative Assistant in the Wellness Area, was then selected for the position, but she was unable to step into the position when it became vacant due to personal reasons. COM, therefore, temporarily assigned Slaughter to the office for the two weeks it took for Myers to return and take over the position.

Finally, COM explained that it had legitimate, non-retaliatory reasons for transferring Slaughter to the Wellness Center. Initially, COM explained that once Myers accepted the position outside of the gym area, it eliminated the classification as a means of limiting costs (Dkt. No. 52, Ex. 1(f)) and decided not to hire or assign an additional Administrative Assistant to the gym. Instead, COM explained that it chose to stretch its capacity by re-assigning one of its two existing Administrative Assistants (Murphy and Slaughter) who worked at the front desk to the gym in the Wellness Center. Since Murphy had more seniority and greater experience in handling monies received by the gym, which was a primary function of the front desk area, the decision was made

15

to keep her at the front desk and have Slaughter cover the gym in the Wellness Center. (Dkt. No. 52, Ex. 1f).

### 3. Pretext

Since COM has articulated legitimate, non-retaliatory reasons for its decisions, the burden, would shift back to Slaughter to produce evidence sufficient to persuade the fact finder at trial that, "but for" protected actions, COM would not have taken the adverse employment action. *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007). To survive COM's summary judgment motion, Slaughter would have to present evidence that is sufficient to allow a reasonable jury to return a verdict in her favor. *See Anderson*, 477 U.S. at 249-50. Having examined all the evidence in this case in a light most favorable to Slaughter, the Court concludes that Slaughter could not carry her burden. Accordingly, the Court finds that Slaughter's retaliation claim under Title VII fails and COM's Motion for Summary Judgement should be **GRANTED**.

## B. Section 1983 Claim

Slaughter brings her claim against COM under §1983. To state a claim under § 1983 a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person[20] acting under

---

[20] Claims under §1983 may be brought against persons in their individual or official capacities, **or** against a governmental entity. *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir.2009) (citing *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)). When the claim is bought against governmental entity, such is the case here, additional proofs are necessary. *See Monell v. Dept. of Soc. Serv. of City of N.Y.*, 436 U.S. 658, 691 (1978) (where the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers); *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir.2001) (to impose "[m]unicipal liability under §1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom.").

color of state law. *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir.2000) (citing *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir.1994)).

The Constitutional claim Slaughter asserts against COM is one of First Amendment retaliation. To establish a First Amendment retaliation claim, Slaughter must show each of the following elements: (1) she suffered an adverse employment action; (2) she spoke on a matter of public concern; (3) her interest in commenting on the matter outweighed COM's interest in promoting efficiency; and (4) her speech motivated COM's action against her. *See Harris v. Victoria Ind. Sch. Dist.*, 168 F.3d 216, 220 (5th Cir.1999). COM maintains that Slaughter cannot establish the elements of this claim. The Court agrees. Slaughter's First Amendment retaliation claim fails because she cannot demonstrate that she suffered an adverse employment action that satisfies the Fifth Circuit's definition for First Amendment retaliation claims under 42 U.S.C. § 1983, *i.e.*, that an adverse action is restricted to "ultimate employment decisions" such as discharges, demotions, refusals to hire, refusals to promote, and reprimands. *Breaux v. City of Garland*, 205 F.3d 150, 157 (5th Cir. 2000); *Gibson v. Kilpatrick*, 734 F.3d 395, 401 n. 4 (5th Cir.2013) (noting that Fifth Circuit has not yet decided whether the *Burlington* standard requiring action to be "materially adverse" in the Title VII context applies to First Amendment retaliation cases); *Jackson v. Tex. S. Univ.*, 997 F.Supp.2d 613, 629, 638, 649–50 (S.D.Tex.2014).[21] The Court, therefore, concludes that summary judgment is warranted for COM on Slaughter's §1983

---

[21] Even assuming the same standard were applied, there is ample evidence, as previously discussed, that Slaughter received no reprimand. The loss of "management" duties and compensation she claims preceded any protected speech (*i.e.,* being identified as a witness) and neither her temporary reassignment, nor her assignment to the Wellness Center rise to the level of a materially adverse employment action.

claim.[22]

## CONCLUSION

Accordingly, it is hereby, **ORDERED AND ADJUDGED** that Defendant College of the Mainland's Motion for Summary Judgment (Dkt. Nos. 52, 53, 54) is **GRANTED** and that the action brought by Plaintiff Jeanette Slaughter is **DISMISSED** in its entirety.

**DONE** at Galveston, Texas, this ___12th___ day of September, 2016.

JOHN R. FROESCHNER
UNITED STATES MAGISTRATE JUDGE

---

[22] Despite her inability to show a violation of a Constitutional right, the Court finds that Slaughter has also fallen far short of her burden of establishing any of the other requisite elements required to impose governmental liability on COM. *Supra* note 20.